FILED

2006 Jun-07  AM 09:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOHN ROMANO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-03-S-1829-NE** |
| | ) | |
| **CHARLES P. SWANSON, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This diversity action, stating claims for negligence and violation of a bailment agreement allegedly resulting in severe damage to plaintiff's rare Porsche race car, is before the court following a bench trial.

### PART ONE

### *Findings of Fact*[1]

Plaintiff, Dr. John Romano, is a resident of the State of Massachusetts and the owner of the 1970 Porsche race car, model 908/3, that is the subject of this litigation. The machine is extraordinarily rare, one of only thirteen constructed, and each hand-made.  It was designed to be run in the Targa Floria race held annually on the island of Sicily.  Dr. Romano purchased the Porsche (or at least its constituent parts, as the

---

[1] The following factual findings are derived from the parties' statement of agreed facts, as well as from the evidence presented at trial.

automobile was in a very incomplete state) in 1999 for $440,000. He associated Dale Miller, a North Carolina resident and consultant specializing in the restoration of historic automobiles, to coordinate the restoration work.[2] By April of 2002, following two-and-a-half years of careful work by restoration specialists, the value of plaintiff's Porsche had increased to $750,000.[3]

On the dates of the events leading to this suit, Mr. Miller was a member of the National Technical Committee of the Porsche Club of America, Inc. — a committee of which defendant Jon Lowe was Chairman and, as will be discussed below, the conduit through which plaintiff's car came into the hands of defendants.

The Porsche Club of America, Inc. ("PCA"), is a national organization of approximately 50,000 owners and enthusiasts of Porsche automobiles. PCA provides opportunities for its members to associate with other Porsche enthusiasts, subscription to *Panorama,* the club's national publication, and forums for sharing technical information. Each PCA member pays annual dues of approximately $50, a portion of which goes to the member's regional affiliate club.

---

[2]According to Miller's deposition testimony, which the parties submitted in lieu of his testimony at trial, Romano did not directly employ Miller to coordinate the restoration of his Porsche. Instead, Miller had purchased and was restoring another of the thirteen 908/3 models. By coordinating the restoration of Romano's model with that of his own, he was able to save a significant amount of money on parts and other costs. This savings served as Miller's compensation for coordinating the restoration of plaintiff's 908/3.

[3]As of the date of trial, the car was estimated to be worth approximately $900,000.

The Heart of Dixie Region ("Heart of Dixie") is a regional affiliate, or chapter, of PCA. It has no legal status other than as "a local sub-set" of PCA.[4] Defendant Charles P. Swanson was Secretary of Heart of Dixie, and a past-president of that regional affiliate.

As noted above, defendant Jon Lowe was Chairman of PCA's National Technical Committee, through which he became acquainted with plaintiff's agent, Dale Miller. Lowe also was a member of Heart of Dixie's Board of Governors.[5] The most important role played by Lowe in the events leading to this litigation, however, was that of Chairman of the committee that organized Heart of Dixie's "Dixie Tech 2002" — the event described below, and the reason for bringing plaintiff's Porsche to Huntsville, Alabama.

*Dixie Tech 2002*

Heart of Dixie annually hosts an affair called "Dixie Tech," an event at which technical information is shared and unusual Porsche automobiles are displayed. "Dixie Tech 2002" occurred from February 22 through 24 of 2002, in a Huntsville, Alabama garage owned by defendant Dr. Cary Collins, D.M.D., who was a member of Heart of Dixie. Collins used the garage as a private workshop when pursuing his

---

[4]*See* doc. no. 50 (Pretrial Order filed July 7, 2005) ¶ 5(a) ("Agreed summary"), at 4.
[5]*Id.*

hobby of restoring vintage automobiles.  Several members of Heart of Dixie, as well as some of Collins's non-club friends, possessed keys to the garage, and some of those individuals stored automobiles in the garage for short periods of time, while using the garage facilities and tools for repairs.  Collins had hosted the Dixie Tech event in his garage for several years prior to 2002.

A volunteer committee chaired by Jon Lowe, and made up of other Heart of Dixie members, including Cary Collins and Charles Swanson, was in charge of planning Dixie Tech 2002.  However, PCA's National Technical Committee arranged for various speakers at the event, and paid the speakers' travel and *per diem* living expenses.  Heart of Dixie charged an admission fee of $55 to defray other expenses.

Technical presentations were delivered all day on Saturday, February 23, and during the morning hours on Sunday, February 24.  Dale Miller gave a presentation on historical Porsche prototypes on Saturday afternoon, and defendant Charles Swanson provided instruction on the proper method of changing the oil in a Porsche model 993 on Sunday morning.

Jon Lowe had encouraged Miller to bring a Porsche 908/3 to a Dixie Tech event for approximately three years prior to 2002.  Lowe testified that a 908/3 would be a major attraction, because it is such a rare and exotic racing machine.  He also testified that his requests were made for the sole benefit of the regional organization,

not for his (or anyone else's) personal benefit.

Miller eventually agreed to display plaintiff's 908/3 at Dixie Tech 2002. Plaintiff had planned to ship the automobile from California, where it had been restored, to Georgia, for its first post-restoration race.  Because Dixie Tech 2002 occurred prior to the scheduled race date, and because Huntsville was relatively near the Georgia race venue, plaintiff agreed to allow Miller to first transport the car to Huntsville for display during Dixie Tech 2002.  Dick Kjelsen, the representative of the PCA "zone" encompassing the Heart of Dixie Region,[6] was aware that Lowe and Miller had arranged for plaintiff's 908/3 to be displayed at Dixie Tech 2002.  Miller testified that the cost of transporting the car to Huntsville was $1,500, approximately the same amount it would have cost to truck the vehicle from California to Georgia. PCA therefore paid Miller $500 to cover the additional cost of transporting the car on the last leg of its eastward transit, from Huntsville to the Georgia race track, following the conclusion of Dixie Tech 2002.

During Miller's Dixie Tech presentation, he used plaintiff's Porsche as a visual aid.  He pushed the car into the cul-de-sac in front of the Collins's garage, where he demonstrated the six-step, sequential procedures for starting its racing engine, a

---

[6]The PCA national club is first divided into zones, which then are subdivided into regions, like the Heart of Dixie Region.  Apparently, each zone has a representative who can be contacted by members and officers of the regions covered by its territory, to provide guidance or information.

process that is unique to the 908/3 models.  Miller did not drive plaintiff's Porsche, however, nor even sit in the driver's seat when starting the engine.[7]

Defendants Cary Collins and Charles Swanson nevertheless claim that Dale Miller gave them permission to drive plaintiff's Porsche.  Each testified that, at the end of Dixie Tech 2002, Miller stated to a small group of people gathered around the car, "drive it if you want to," or words to that effect.  Both men admit being surprised at Miller's statement, but each alleges he took Miller seriously — although Swanson acknowledged that Jon Lowe later told him that Miller "must have been joking."[8]  Dale Miller described the comments attributed to him, and relied upon by Collins and Swanson, as follows:

> After the presentation there were a group of people, 6 to 8 in number — I don't know exactly how many — standing around the car with me.  And there were a number of questions being asked about the car — what's this, what's this do, what does this function add and so on.  And a question was then asked — and I don't remember [by] whom — what's it like to drive.  And I said it's like driving an oversized go-cart or a glorified go-cart or a go-cart on steroids.  And I've used that expression in the past to explain that.  *And I said that you could take it down to the grocery store*, meaning it's a very docile car to drive on the street, very nimble.  *I in no way said specifically "you"* to any one person *are permitted to drive this*.  "You" meant that if someone were to drive the car on the street that they would find it to be a very easy car

---

[7]Two other, non-racing, Porsche automobiles were on display during Dixie Tech 2002, and the owner of those automobiles allowed some spectators to drive them short distances.

[8]Dale Miller testified that he often used humor to make his presentations more appealing to audiences, as technical subjects can be dry and dull.  Jon Lowe confirmed that Miller liked to joke around, and was known for his sense of humor.

to drive on the street.  It's not a street-licensed car.  It's not street legal.[9]

*Arrangements for Storage of Plaintiff's 908/3*

Jon Lowe asked Cary Collins to provide storage for plaintiff's Porsche in his garage, from the time of its delivery to Huntsville, until the car was transported to Georgia following the conclusion of Dixie Tech 2002.  Collins agreed to maintain the car safely under lock and key.  He did not receive monetary compensation for doing so, and characterized his agreement as merely "a favor" to the club.  Collins also did not have any discussions with either Jon Lowe or Dale Miller about liability for damage to the vehicle before or after it arrived at his garage, and Lowe and Miller did not have any such discussions between themselves.  Jon Lowe was present when the car was delivered to Collins's garage, and signed the bill of lading accepting delivery.

Collins testified that, prior to the arrival of plaintiff's Porsche, he did not discuss with Lowe, Miller, or anyone else how long it was to be stored in his garage following the conclusion of Dixie Tech 2002.  Indeed, that topic did not arise until some weeks after the event, and there is much discrepancy in the trial testimony about the substance of those discussions.  According to Collins, Lowe informed him that he would need to provide storage for only about a week and a half following the conclusion of Dixie Tech, until a transporter arrived to pick-up the vehicle and take

---

[9]Trial Exhibit 14, at 32-33 (emphasis supplied).

it to the Georgia race track.  Lowe testified that it was his impression the car would remain in Collins's shop for approximately two to three weeks after Dixie Tech 2002. Finally, Miller testified that his agreement with Jon Lowe was for the car to be stored in Collins's garage until *either* the date of a race in Savannah, Georgia (which was scheduled to occur approximately two to three weeks following the conclusion of Dixie Tech 2002), *or* the date of a race in Atlanta, Georgia (which was scheduled approximately two to three weeks after the Savannah race).  According to Miller, plaintiff's work schedule prevented him from attending the Savannah race, and Miller therefore decided to leave the automobile in Collins's garage until a date closer to that of the Atlanta race.  Miller testified that he informed Lowe of his plans regarding the Atlanta race.  Collins, Miller, and Lowe did not memorialize any terms of the storage agreement in writing.

Collins testified that he became "nervous" about providing storage for the 908/3 several weeks after the Dixie Tech 2002 event.  He telephoned both Jon Lowe and Jeff Gedcke (then President of the Heart Dixie Region), to inform each of his concerns, and to ask when the car would be removed.  Collins believed that responsibility for making pick-up arrangements fell to either Lowe, as Chairman of the organizing committee for Dixie Tech 2002, or to Gedcke, as President of the Regional organization sponsoring the event.  Collins had no direct contact with either

Miller or plaintiff regarding pick-up and transportation arrangements.

Collins sent Jon Lowe an email on March 25, 2002, stating, in pertinent part, that he was "Getting a little nervous with this thing being in the shop.  I assume the Porsche Club is still responsible for the health of the car."[10]  Lowe replied, in an undated email, saying "Cary, I've been trying to reach Dale [Miller], both by email and phone.  No luck so far.  Will keep trying."[11]  Two days later, Collins sent the following email to Lowe: "Jon, Do you have Jeff[ Gedcke]'s email?  Car will make an interesting planter."[12]  Lowe replied that same day, providing Jeff Gedcke's email address and stating, "I contacted Dale [Miller].  Asked him to email or call you.  Gave him shop, home and work numbers, and this email.  Please let me know if he does not contact you in a couple of days.  I preferred that he discuss with you directly."[13]

In the meantime, and in addition to telephone calls between Lowe and Miller, and correspondence between Collins and Gedcke, the following emails were exchanged by Dale Miller and Jon Lowe.  Miller wrote to Lowe on March 25, 2002, saying:

Jon,

---

[10]Trial Exhibit 2R.

[11]*Id.*

[12]*Id.*  Collins later clarified that he jokingly intended this comment to mean that, if the car stayed in his shop much longer, he might plant flowers in it.

[13]*Id.*

Sorry about not replying earlier . . . I also got your phone message.  I've been out of town to the west coast, and Dallas, and San Antonio for the last 5 days . . . just got back.

Hell, just keep the damn thing . . . and put gas in it when you need to use it.

Seriously, if you can arrange to deliver it to the [Atlanta race] for me . . . if yourself or a friend can . . . I will pay $500 for that to occur (that is what you had the region give me) . . . or if someone does it for no charge . . . I'll send the money back to your region.  It will need to be at the [Atlanta race] on Wednesday, April 24 late in the day.

What do you think??

All the best,

Dale.[14]

Lowe replied:

Dale,

My trailer isn't wide enough, and I know of no one else in the area that has one big enough.  Heck, I don't know of anyone else in the region that has a car hauling trailer, period!  I know I'd be VERY nervous about the liability and insurance of something so rare and exclusive.  Auto Assets may be willing to swing by on their way to RA, as I know they will do the [Atlanta race].  They definitely have the right equipment.

I think Cary is getting nervous about it remaining in his shop for so long; he thought that it would be there for 2-3 weeks after Dixie Tech.  I'd suggest you call him or email him.    His email is "colmar@hiwaay.net" And his phone numbers are:

256-881-9818 (shop) (Best)

256-881-2310 (home)

256-883-1000 (work, he's a dentist, working 3 days a week).

Wish I could be more help, but I don't know a better answer.

Have a day!

Jon Lowe.[15]

---

[14]Trial Exhibit 2M.

[15]Trial Exhibit 2N.

Miller testified that he did place a telephone call to Collins, as suggested by Jon Lowe, but his call was answered by a machine, on which he recorded a message stating that plaintiff's race car would be picked-up on April 8, 9, or 10. Miller's telephone records confirm that he placed a call to Collins on April 3, 2002, but Collins denies that a message was recorded on his answering machine.

*Swanson and Collins Drive the 908/3*

At approximately 7:00 a.m. on the morning of April 7, 2002, several persons — including defendants Cary Collins, Charles Swanson, and two or three other friends — gathered in Collins's garage to share breakfast. Collins testified that he hosts similar gatherings on a regular basis, and the record indicates that the breakfasts were informal and independent — not an official function of either PCA or its Heart of Dixie regional organization. Collins and his friends usually consumed wine at their breakfast gatherings, to emulate the culture of European nations they wanted to visit. Collins testified that he drank "one glass" of wine during breakfast on April 7, while Swanson said that he had "two or three glasses."

After breakfast, Collins and Swanson began to discuss the prospect of driving the 908/3. Swanson testified that he and Collins had engaged in similar discussions on four or five occasions during the preceding weeks. He described the essence of their discussions as follows: "Week in and week out I'd come back there and the car

was still sitting there and Cary was irate that it was still there.  And, you know, we talked about since he [Miller] said drive it, you know, one of these days maybe we ought to drive it you know."[16]

Perhaps fueled with bravery from the wine consumed during breakfast that day, the two men decided that April 7, 2002 was *the* day they should drive *the* car.

At approximately 11:00 o'clock a.m., Swanson started the car's powerful racing engine.  Collins testified that he was in the shop when the engine was started, and he was aware of what Swanson was doing, but he did not assist Swanson in the six-step, ignition procedure.  Collins also testified that he did not stop Swanson, because Swanson was an officer of Heart of Dixie, and he also believed Dale Miller had given both of them permission to drive the car.

Swanson testified that he drove the Porsche only a short distance that morning, approximately one block down the street on which Collins's garage was located. When Swanson returned, Collins drove the automobile.  Collins testified that he drove only to the end of the street and back, but Swanson's testimony did not corroborate that assertion; Swanson said Collins told him that he had driven the car to an autocross show at a nearby airport.  In any event, an email was sent to Jon Lowe from Swanson's email account at 12:31 p.m. that day.  It stated:

---

[16]Trial Transcript, at 153, lines 12-16.

Hi Jon –
Tell dale [sic] that we took the 908 to an auto cross at the airport, and we
had a problem getting it into 4th gear.
*Otherwise it is a real rocket ship.*
Charlie & Cary.[17]

Lowe testified that he did not read this email until much later that evening.

Collins said that he wanted to drive the Porsche because it is so rare and exotic.
In his words, "Very few people have had a chance to drive those cars.  I'd like my
grandchild to know that I drove a 904, a Carrera speedster[,] and a 908/3."[18]  Collins
also agreed that he wanted to drive the car for the sake of attaining "bragging
rights."[19]  Swanson testified to his belief that Miller had given him and Cary Collins
permission to drive the car, and doing so simply "seemed like the thing to do."[20]

*The Wreck*

Following the titillating and heady experiences of the morning, Swanson
departed Collins's garage to have lunch at his own home, during which he consumed
"two to three" *additional* glasses of wine before returning to the garage.  Collins
drove the car once more, but only a short distance down the street and back.  Swanson
then got into the driver's seat.  Shortly after engaging the transmission, however,

---

[17]Exhibit 2E (emphasis supplied).
[18]Trial Transcript, at 103, lines 15-18.
[19]Trial Transcript, at 122-23.
[20]*Id.* at 179.

Swanson lost control, veered sharply to the right, and plowed into a telephone pole located approximately 150 feet from his starting point.  On impact, the pole ran through the car to the fire wall, and ripped the left front-suspension from the frame. The entire front-end of the vehicle was demolished.  Swanson suffered injuries, including a broken ankle, and was taken to a hospital by ambulance.   At approximately 4:00 p.m., Collins sent Lowe an email containing the following text:

> Unfortunately, Charlie took the 908 out for a spin and ended up in a telephone post.  Front end of car is destroyed and Charlie is in Crestwood Hospital.
> Interesting turn of events.
>
> Will keep you informed,
> Cary[21]

When Lowe first read this email, he did not believe it, and thought Collins was pulling his leg.  After placing a telephone call to Collins, however, and being convinced that the wreck was no joking matter, Lowe telephoned Dale Miller.  Lowe suggested that Miller call Collins for details.   Lowe also informed other PCA officials, including the insurance representative, national lawyer, and zone representative.  Miller did call Collins, who told him that PCA "would take care of everything," and that Miller shouldn't worry.[22]

---

[21]Exhibit 2S.

[22]Plaintiff's Exhibit 14 (Deposition of Dale Miller), at 36.

The day after the wreck, Lowe went to Collins's garage to assess the extent of damage.  After observing its severity, Lowe again called Miller, and suggested that he come to Huntsville.  Miller did travel to Huntsville within a couple of days, assessed the damage, and arranged for the car to be returned to the same California shop at which it previously had been restored.  Dale Miller attempted to call Collins several more times, but Collins testified that he did not accept or return the telephone calls because he was angry with Miller for leaving the car in his garage so long.  Swanson placed a telephone call to plaintiff following his release from the hospital, to apologize for wrecking his car, but he did not personally contact either Miller or Lowe.

Plaintiff's Porsche was shipped back to California on April 19, 2002, to begin the restoration process anew.  Charlie Swanson signed the bill of lading when the car was picked-up at Collins's garage for its trip back to California.  At the time of trial, repair of the damage resulting from the wreck had just been completed.

## PART TWO

### *Conclusions of Law*

Although no model of clarity, the court construes plaintiff's complaint as asserting a claim for negligence against defendant Charles P. Swanson, and claims for both negligence and breach of a bailment agreement against defendants PCA,

Heart of Dixie, Jon Lowe, Cary C. Collins, and Margie M. Collins.[23]  All claims are

based upon the law of Alabama.[24]

Before turning to a discussion of plaintiff's contentions, the court pauses to

note that he cannot prevail on any of his claims against defendant Margie M. Collins,

the wife of defendant Cary Collins.  Mrs. Collins is relevant to these proceedings only

because she and her husband held title to the garage in which plaintiff's Porsche was

stored as joint tenants.  However, plaintiff has not shown, much less proven, that Mrs.

Collins had anything to do with the events leading to this suit.

A.    **Negligence**

"In any negligence case, the plaintiff bears the burden of proving the existence

of a duty owed by the defendant, a breach of that duty, causation, and damage."

*Glass v. Birmingham Southern Railroad Co.,* 905 So. 2d 789, 794 (Ala. 2004)

(citation omitted).[25]

---

[23]The negligence claims asserted by plaintiff have five facets:  *i.e.* "a. Misappropriating the Vehicle without authority; b. Negligently damaging the Vehicle; c. Driving while legally intoxicated; d. Allowing the Secretary of the organization [Swanson] to drive John Romano's Porsche while intoxicated; [and] e. Failing to disable the Vehicle from being operated following the Dixie Tech 2002 presentation . . . ."  Doc. no. 1 (Complaint) ¶ 19, at 4.

[24]This is a diversity jurisdiction case.  *See* 28 U.S.C. § 1332(a)(1).  Accordingly, under the *Erie* doctrine, the court must apply state substantive law and federal procedural and evidentiary rules. *See*, *e.g.*, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-45 (11th Cir. 1982).

[25]*See also* 2 *Alabama Pattern Jury Instructions – Civil* § 28.00, at 5 (Supp. 2005) (reciting that a plaintiff "must prove to [the fact finder's] reasonable satisfaction all of the following:  1. That [defendant] was negligent; 2. That [plaintiff] was harmed; and 3. That [defendant's] negligence was

**1**.   *Charles P. Swanson*

Plaintiff unquestionably presented more than sufficient evidence to satisfy all elements of his negligence claim against Charles Swanson.  Regardless of the manner in which the relationship between plaintiff and Swanson is characterized, the law imposed a duty upon Swanson to exercise reasonable care not to damage plaintiff's rare, and extremely valuable, 908/3 Porsche race car; "that is, to exercise such care as a reasonably prudent person would have exercised under the same or similar circumstances."[26]  Swanson breached that duty by driving an extraordinarily powerful and exotic race car that required specialized training and experience to operate competently — all after having consumed, by his own admission, at least four glasses of wine.[27]   There is no dispute that Swanson's acts were *a cause* of damage to plaintiff's Porsche.[28]

Indeed, Swanson has made little attempt to argue a defense.[29]   He

---

*a cause* of [plaintiff's] harm.") (emphasis supplied).

[26]*Id*. § 28.02, at 32.

[27]"A person who is voluntarily intoxicated must use the same care as a sober person would use in a similar circumstance."  *Id*. § 28.14 (Supp. 2005).

[28]*See supra* note 25.  For as long as this judge can remember, the law of Alabama described the causation element of a *prima facie* negligence claim in terms of "proximate cause," a phrase that was defined as "that cause which in the natural and probable sequence of events, and without the intervention of any new or independent cause, produces the injury and without which such injury would not have occurred."  *Id*. § 33.00, at 264 (2d ed. 1993).  Recently, however, the definition of this element of proof was recast as follows:  "The cause of harm is that cause that naturally and probably brings about the harm."  *Id*. § 33.00, at 39 (Supp. 2005).

[29]This court wholly rejects Swanson's assertion that he and Cary Collins had been granted

acknowledges that he had been drinking on the day he wrecked plaintiff's car (and more than just a little), and that he had neither training nor prior experience in driving such a vehicle  He also rightly acknowledges that it was an incredibly stupid thing to do.  He filed no separate pre-trial or post-trial briefs to argue against his liability. Instead, his only defense strategy (and the court agrees it is the only strategy reasonably available to him) is that other defendants should also be held liable.

**2.** *Cary C. Collins*

Plaintiff summarized his negligence claim against Cary Collins in his post-trial brief, saying that

> Collins agreed to safeguard Romano's 908/3 for the benefit of his club, PCA.  Instead of adequately safeguarding Romano's 908/3, Collins drove it and allowed it to be driven by Charles Swanson, after Collins and Swanson had been drinking alcohol (wine).  While Swanson was driving Romano's 908/3 with Collins' permission, Swanson wrecked the 908/3.  Collins and Swanson should pay for the damages that they caused or allowed to occur.[30]

To succeed on this claim, plaintiff must establish that Collins negligently breached

---

permission to drive plaintiff's Porsche by Dale Miller.  The assertion is not credible; nor was it reasonable for Swanson and Collins — Porsche enthusiasts who fully comprehended the extraordinarily high value of plaintiff's car — to believe that Dale Miller would give them permission to drive it when each lacked training and skill to do so, and when it was not legal to drive such a vehicle on public streets.  That is particularly true with regard to Swanson, as he testified that Lowe told him Miller "must have been joking" when making comments about driving the car. Further, even if Miller had granted Swanson and Collins permission to *drive* the car, he certainly did not grant them permission to drive it in a negligent manner, after consuming several glasses of wine.

[30]Doc. no. 60 (plaintiff's post-trial brief), at 20 (emphasis supplied).

a duty of care owed to plaintiff, and that such negligence combined and concurred with that of Swanson[31] to cause the damages complained of.  *See Glass,* 905 So. 2d at 789.

Although Collins denies that he owed plaintiff *any* duty, he alternatively argues that the only duty that might be implied under the facts was that of caring for plaintiff's Porsche in the same manner, and to the same extent, that Collins cared for other vehicles stored in his garage.  Collins also contends that any of the persons who possessed keys to his garage could have driven plaintiff's Porsche at any time, and there would have been nothing he could do to stop them.  Finally, Collins asserts that he allowed Swanson to drive plaintiff's Porsche only because Swanson was an officer in Heart of Dixie and, therefore, had "a right" to control the vehicle.  These arguments are not persuasive.

Collins's acceptance of plaintiff's Porsche was unlike his storage of other vehicles owned by friends who used his shop facilities for making repairs.  Plaintiff's Porsche came into Collins's garage under special arrangements, for a special event, on behalf of PCA and its Heart of Dixie regional organization.  Plaintiff's Porsche was *far* more valuable than any other automobiles stored by Collins for friends.

---

[31]*See* 2 *Alabama Pattern Jury Instructions – Civil* § 28.04, at 7 (Supp. 2005) (observing that the negligence of two or more persons may combine and concur to cause harm, and that each person's negligence "is a cause of harm if it naturally and probably brings about the harm").

Plaintiff's 908/3 did not have a standard ignition device; instead, a unique, six-sequential-step, keyless procedure was required to start the exotic engine. Thus, it would not have been "easy," as Collins asserts, for any of the persons having keys to his garage to start the Porsche's engine and drive it away.

This court finds Collins's assertion that he allowed Swanson to drive plaintiff's Porsche only because of Swanson's official status to be utterly unpersuasive, and also gives absolutely no credence to Collins's assertion that he and Swanson had been granted "permission" to drive the vehicle by Dale Miller.[32]

What, then, were the parameters of the tort "duty," or standard of care, owed by Collins to plaintiff?

Justice Cardozo succinctly stated the answer long ago, while still serving as a judge of New York's highest court. "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275 (1922). In like manner, the Supreme Court of Alabama has recognized, since at least 1911, that "liability can arise from the negligent performance of a voluntary undertaking." *Beasley v. McDonald Engineering Co*., 287 Ala. 189, 193, 249 So. 2d 844, 846 (1971) (citing *Parker & Bro. v. Hodgson*, 172 Ala. 632, 635 55 So. 818, 819

---

[32]*See supra* note 29.

(Ala. 1911)).  *See also*, *e.g.*, *George H. Lanier Memorial Hosp. v. Andrews,* 901 So. 2d 714, 723 (Ala. 2004) (same).[33]

It is true that Collins agreed to store plaintiff's Porsche at the request of Jon Lowe, the Chairman of the Heart of Dixie committee that organized Dixie Tech 2002, and not plaintiff or his agent, Dale Miller.  Collins nevertheless testified repeatedly that he agreed to provide storage under "lock and key" for a rare and exotic race car worth (at the time) at least $750,000.  Collins thereby voluntarily assumed a duty of

---

[33]*See also Restatement (Second) of Torts* § 324 A (1965), which reads as follows:

> **Liability to third persons for negligent performance of undertaking**.  One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a)  his failure to exercise reasonable care increases the risk of such harm, or
>
> (b)  he has undertaken to perform a duty owed by the other to the third person, or
>
> (c)  the harm is suffered because of reliance of the other or the third person upon the undertaking.

Another section of the Restatement also may apply to the facts of this case.

> **Negligent Performance of Undertaking to Render Services**.  One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a)  his failure to exercise such care increases the risk of such harm, or
>
> (b)  the harm is suffered because of the other's reliance upon the undertaking.

*Id*. § 323.

providing reasonable care for the vehicle.  He breached that duty when he allowed Swanson to drive the car, because Collins clearly knew that the 908/3 was designed solely as a race car; that it was extremely powerful; that it required specialized training and experience to safely drive it; that neither he nor Swanson possessed such training or prior experience; and, that Swanson had consumed several glasses of wine.[34]

This court now must consider whether Collins's breach of duty was a cause of damage to plaintiff's race car.  In that regard, the Alabama Supreme Court has held that,

> while proximate cause is not necessarily the cause nearest the injury, the word "proximate" adds the requirement of unbroken causation between an act and an injury produced by that act.  A cause within this unbroken chain of causation is said to be "proximate," and therefore actionable, while a cause not within the chain is said to be "remote" and, thus, not actionable.
>
> In Alabama, as elsewhere, *forseeability is the cornerstone of proximate cause.*  As a result, one is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, *including the negligence of others*.  In short, as this Court has frequently stated, and as the trial court in this case correctly instructed the jury, a particular cause is considered the proximate cause of an injury if, in the natural and

---

[34]Indeed, if the circumstances were the other way around, and Dr. John Romano had permitted Charles Swanson to drive a rare and extraordinarily valuable Porsche owned by Cary Collins under the same circumstances, this court is sure beyond peradventure that Cary Collins would possess as much umbrage for Dr. Romano, as Romano does for Collins and Swanson.

probable sequence of events, and without intervention of any new or
independent cause, the injury flows from the act.

*General Motors Corp. v. Edwards,* 482 So. 2d 1176, 1194 (Ala. 1985) (citations

omitted) (emphasis supplied), *overruled on other grounds by Schwartz v. Volvo North*

*America Corp.,* 554 So. 2d 927 (Ala. 1989).[35]

Collins's negligent failure to deter Swanson from driving the Porsche under the

circumstances described above[36] was *a* significant cause of plaintiff's damage, if not

*the* proximate cause of damage.  Indeed, a reasonably prudent person in Collins's

circumstances — fully aware of the design, power, rarity, and value of plaintiff's

908/3, of its sole intended purpose as an exotic racing vehicle, of Swanson's utter

lack of training to competently drive such a vehicle, and of Swanson's consumption

of wine throughout the day — should reasonably have thought it possible, if not

probable, that Swanson would wreck the car if he drove it.  *See id.* at 1194.

Moreover, Swanson's negligence was not an "intervening cause," operating to

break the chain of causation between Collins's negligence and the injuries to

plaintiff's Porsche.[37]

---

[35]*See supra* notes 25 and 28.

[36]*See* 2 *Alabama Pattern Jury Instructions – Civil* § 28.01 (defining negligence, in part, as
failing to do that which a reasonably prudent person would have done under the same or similar
circumstances).

[37]*See Edwards*, 482 So. 2d at 1194 ("Loosely defined, an 'intervening cause' is one which
occurs after an act committed by a tortfeasor and which relieves him of his liability by breaking the
chain of causation between his act and the resulting injury.") (citing *Vines v. Plantation Motor*

-23-

> In order to be an intervening cause, a subsequent cause also *must have been unforseeable* and must have been sufficient in and of itself to have been the sole "cause in fact" of the injury. *If an intervening cause could have reasonably been foreseen at the time the tortfeasor acted*, it does not break the chain of causation between his act and the injury.

*Edwards,* 482 So. 2d at 1195 (emphasis supplied) (citing *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976); *Morgan v. City of Tuscaloosa*, 268 Ala. 493, 108 So. 2d 342 (1959); and *Louisville & N.R. Co. v. Courson,* 234 Ala. 273, 174 So. 474 (1937)).

Of course, Swanson's negligence occurred *after* Collins failed to deter him from driving plaintiff's Porsche; but then, Swanson's negligent act occurred *only because* Collins failed to deter Swanson from driving plaintiff's Porsche.[38]  This paradox does not pose the proverbial "chicken and egg" conundrum, nor does it prevent the imposition of liability upon one or the other.  Instead, it is a classic example of *a joint tort* — "where the behavior of two or more tortfeasors is such as to make it proper to treat the conduct of each as the conduct of the others as well." 3 Fowler V. Harper, Fleming James, Jr. & Oscar Gray, *The Law of Torts* § 10.1 (2d ed. 1986).  In other words, Swanson's negligence did not break the chain of causation between the negligence of Cary Collins and the resulting damage to plaintiff's

---

*Lodge,* 336 So. 2d 1338 (Ala. 1976)).

[38]*See supra* note 36.  Indeed, in a very real manner of speaking Collins "egged Swanson on," by Collins's example of twice driving the Porsche himself.

Porsche; instead, the acts of each man combined and concurred to cause the wreck.[39]

Accordingly, judgment will be entered in favor of plaintiff, and against both defendants, for negligence.[40]

**B**.   **Bailment**

Plaintiff asserts in paragraph 16 of his complaint that "Defendants, Cary and Margie Collins and the Porsche Club of America, Inc., and/or its regional division, the Porsche Club of America Heart O'Dixie Region were the *bailees of the Vehicle owned by John Romano*, and said defendants violated their duties to John Romano."[41] Conspicuously absent from this list of allegedly culpable defendants is Jon Lowe, the man who badgered Dale Miller to bring a Porsche 908/3 to a Dixie Tech event, and then persuaded Cary Collins to provide storage for the vehicle.[42] Also absent is Dale Miller, who the court cannot help noticing persuaded plaintiff to allow *his* car to be delivered to Huntsville, Alabama, rather than transporting his (Miller's) own 908/3 to Dixie Tech 2002.[43]

Be that as it may, a "bailment" can be generally defined as the delivery of

---

[39]*See supra* note 31.

[40]Collins did not raise any affirmative defenses to plaintiff's negligence claim in his answer to the complaint.

[41]Doc. no. 1 (Complaint), at ¶ 16 (emphasis supplied).

[42]*See* Trial Transcript, at 184-85 (counsel for plaintiff attempts to stipulate that his client's claims against Jon Lowe may be dismissed).

[43]*See supra* note 2.

personal property by one person (called "the bailor") to another person (called "the bailee"), who accepts the property in trust for a specific purpose; and who, upon accomplishment of that purpose, either returns the property to the bailor, or disposes of it in accordance with the terms of the trust.  *See*, *e.g.*, *Ziva Jewelry, Inc. v. Car Wash Headquarters, Inc.,* 897 So. 2d 1011, 1014 (Ala. 2004).  *See generally* 1 *Alabama Pattern Jury Instructions – Civil* § 7.00, at 122 (2d ed. 1993) (collecting cases).

A contract of bailment may be written or oral.  *See*, *e.g.*, *Suits v. Electric Park Amusement Co.*, 249 S.W. 656, 657 (Mo. Ct. App. 1923) ("[A]n oral bailment is as valid as a written one.").  Further, "a contract of bailment may be express or implied." *Joseph v. Mutual Garage Co., Inc.*, 270 S.W.2d 137, 141 (Mo. Ct. App. 1954); *see also Ziva Jewelry*, 897 So. 2d at 1014 ("A bailment is defined as the delivery of personal property by one person to another for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it.  In order for a bailment to exist the bailee must have voluntarily assumed the custody and possession of the property for another.").  As the Supreme Court of New Jersey observed long ago, the terms of bailment agreements "are rarely expressed at length.  Much must be left to implication and be determined

in accordance with the business usages and the customs of the times." *Corbett v. Sumeraldo*, 102 A. 889 (N.J. 1918).

The degree of care imposed by law upon a bailee while in possession of property entrusted to him, and his liability for loss or damage to the bailed property, generally depends upon the benefit received by the bailee, if any. For example, if the bailment is solely for the benefit of the bailor, with no benefit inuring to the bailee (a so-called "gratuitous bailment"[44]), then the bailee is required to exercise only "slight care" for the protection, preservation, and return (or other disposition) of the bailed property.[45] "Slight care" is defined as "that degree of care which every person of common sense, though very inattentive, applies to his own affairs."[46] It follows, therefore, that "[g]ross negligence on the part of the bailee violates the duty to exercise slight care."[47]

If, on the other hand, the relationship is "lucrative" for the bailee,[48] or is a commercial transaction in which the relationship between the property owner and the

---

[44]*See*, *e.g.*, 1 *Alabama Pattern Jury Instructions – Civil* § 7.01, at 124 (2d ed. 1993).

[45]*Id*. § 7.07 (first para.), at 133.

[46]*Id*. (second para.).

[47]*Id*. (third para.).

[48]*See id*. § 7.02, at 125 ("A lucrative bailment is one which is undertaken upon a consideration and for which a payment is to be made to the bailee, or from which he is to derive some advantage or benefit.").

person to whom it is entrusted is described as "a bailment for hire,"[49] then the bailee comes under a duty to exercise "reasonable" or "ordinary" care for the protection, preservation, and return of the bailor's property.[50]  The definition of the standard of reasonable or ordinary care is the same, regardless of whether a plaintiff's claim is for breach of a bailment agreement, or sounds in tort, for the bailee's negligence — that is, "such care as a reasonably prudent person would exercise under the same or similar circumstances."[51]

When the bailment is for the sole benefit of the bailee, however, he comes under a duty to exercise "extraordinary care" for the protection, preservation, and return of the bailor's property.[52]  "Extraordinary care" is defined as "the highest degree of care, diligence and skill known to careful, diligent and skillful persons [engaged in such (business) (activity)]."[53]  Stated differently, even the slightest negligence on the part of the bailee violates the duty to exercise extraordinary care.[54]

---

[49]*See* 1 *Alabama Pattern Jury Instructions – Civil* § 7.03, at 126 ("A bailment for hire is a contract whereby the bailor agrees to pay for the safekeeping of the property entrusted to the custody of the bailee; and the bailee agrees to keep the property and restore it to the bailor in substantially the same condition as received.").

[50]*Id*. § 7.05 (first para.), at 129.

[51]*Id*. (second para.), at 129; *see also* 2 *Alabama Pattern Jury Instructions – Civil* § 28.01 (first para.), at 30 (defining negligence as meaning "the failure to exercise (reasonable) (ordinary) care; that is, such care as a reasonably prudent person would have exercised under the same or similar circumstances").

[52]*Id*. § 7.06 (first para.), at 131.

[53]*Id*. (second para.).

[54]*See id*. (third para.).

1.   *Cary C. Collins*

Defendant Cary Collins insists that his acceptance of plaintiff's Porsche for storage in his garage before, during, and after Dixie Tech 2002 was for the sole benefit of the sponsoring organizations, PCA and its Heart of Dixie Region. Certainly, no monetary consideration flowed to Collins.[55]  Yet, that is not the end of the analysis.

A so-called "lucrative bailment" does not necessarily require that money change hands; instead, it may arise from a relationship in which the bailee derives some benefit, *see* 1 *Alabama Pattern Jury Instructions – Civil* § 7.02, at 125, even if that "benefit" be an intangible one.  *See Hardegg v. Willards*, 33 N.Y.S. 25 (N.Y. Ct. Comm. Pleas 1895) (holding, as a matter of law, that the exhibition of an artist's painting in defendant's gallery was "a reciprocal benefit" and "a mutual advantage" to both parties of the implied bailment agreement).  Here, Collins admitted that he acquired the thrill and benefit of "bragging rights"[56] from having stored and driven plaintiff's rare and exotic race car; in his words, "Very few people have had a chance

---

[55]Looking at the reverse side of the same token, it is difficult to see what benefit *plaintiff* derived from the bailment, other than having his valuable automobile stored under roof and behind (somewhat) locked doors, rather than exposed to either the elements or any curious spectator who might amble along.  Given the extraordinary value of the rare vehicle, however, that seems precious little "benefit."

[56]Trial Transcript, at 122-23.

to drive those cars[, and] I'd like my grandchild to know that I drove . . . a 908/3."[57] In the opinion of this court, that was sufficient benefit to impose upon Collins the duty to provide reasonable or ordinary care for the protection, preservation, and return of plaintiff's extraordinarily rare and valuable automobile in an undamaged condition, a duty that Collins surely breached. *Cf.*, *e.g.*, *Joseph*, 270 S.W.2d at 140 ("[W]here the bailment is for the benefit of both parties, the bailee, in the absence of a special agreement, is liable for the loss of, or damage to, the subject matter of the bailment only when the loss or damage was caused by his failure to exercise reasonable or ordinary care for the protection of the property."); *id.* at 142 ("When plaintiff left the car in the garage for care and storage, the defendant assumed the obligation not only to use due care in the performance of the services required, *but to keep it in the garage and not let anyone use it without the consent of plaintiff.*") (emphasis supplied);[58] *Colburn v. Washington State Art Ass'n.*, 141 P. 1153 (Wash. 1914) (finding that the exhibition of plaintiff's jewelry in defendant's museum created an implied bailment for the mutual benefit of both bailor and bailee).

Even if this court were to accept Collins's assertion that his storage of plaintiff's Porsche was purely "a favor," and construe the relationship between him

---

[57]*Id.* at 103.

[58]*See supra* note 29, wholly rejecting the assertion of defendants Collins and Swanson that Dale Miller gave them permission to drive plaintiff's Porsche.

and plaintiff as a "gratuitous bailment," the facts discussed in Part Two, sub-part (A)(2) *supra*, elevated Collins's conduct above mere negligence, to the level of gross negligence, for which liability still would be imposed.  *See*, *e.g.*, 1 *Alabama Pattern Jury Instructions – Civil* § 7.07 (third para.) (2d ed. 1993) ("Gross negligence on the part of the bailee violates the duty to exercise slight care.").  Collins did not exercise even "slight care" when he allowed Swanson to drive plaintiff's 908/3.

In view of these conclusions, this court finds it both surprising and inexplicable that plaintiff's attorney apparently abandoned bailment as a theory for imposing liability upon Cary Collins.[59]  In his pre-trial brief, counsel stated that:

> *Romano had no contacts at all with Collins and/or Swanson.  Romano entrusted his valuable car to PCA, not to Collins.*  Romano's agent [Dale Miller] learned that Collins owned the garage where the car was

---

[59]Issues and contentions not raised in a party's brief are deemed abandoned.  *Cf.*, *e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Lucas v. W.W. Grainger, Inc.* 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

> being stored by PCA, but Romano's agent formed the agreement to
> show and store the car with John [sic] Lowe at a PCA Technical
> Committee meeting. *Romano/Miller did not form any agreement with
> Cary Collins individually about car storage.* The adequacy of PCA's
> choice of a place to store and show Romano's car is a risk that PCA
> should bear, rather than Dr. Romano.[60]

As a consequence, the court now turns to plaintiff's bailment claims against the

remaining defendants.

### 2. *Porsche Club of America, Inc., and its Heart of Dixie Region*

As an initial matter, the court again notes the parties' stipulation that the "Heart

of Dixie Region" is not an entity subject to suit, and has no legal status, other than as

"a sub-set" of PCA.[61] The court therefore will look through the gossamer veil of

Dixie, and construe the actions taken by or on behalf of that organization as actions

of its parent, PCA.

In *Ziva Jewelry, supra,* the Alabama Supreme Court found that a bailment

relationship was created when a customer left his automobile at defendant's car wash

for cleaning. The customer paid a fee for that service, a fact that gave rise to a

"lucrative bailment," or "bailment for hire," imposing a duty of reasonable or

ordinary care upon the bailee car-wash establishment. *See* 897 So. 2d at 1015

("Smith delivered his vehicle to CWH [*the defendant*] for the specific purpose of

---

[60]Doc. no. 52 (plaintiff's pre-trial brief), at unnumbered page 3 (emphasis supplied).

[61]Doc. no. 50 (Pretrial Order) ¶ 5(a), at 4.

having the car washed.  He paid a fee for that service.  As a result, CWH owed Smith a duty to use reasonable or ordinary care with regard to Smith's vehicle.").  When an employee of the bailee took the customer's automobile on a jaunt of his own, and damaged it, the bailee was held liable.

Here, Dale Miller, acting as plaintiff's agent, entered into an agreement with Jon Lowe, acting on behalf of Heart of Dixie (and, thereby, PCA), to transport plaintiff's Porsche to Huntsville for display at Dixie Tech 2002.  Lowe agreed that the local club would provide storage for the car until it was transported to Georgia for plaintiff's upcoming race.  In short, plaintiff delivered his car to PCA for display at an event benefitting that organization,[62] and PCA accepted possession of the car when it was delivered to Cary Collins's garage and Jon Lowe signed the Bill of Lading.  Thus, PCA's argument that no bailment relationship existed between it and plaintiff is unavailing.

PCA argues no bailment existed because there was no "meeting of the minds," due to the disagreements among the parties as to how long plaintiff's 908/3 was to be stored in Collins's garage following the conclusion of Dixie Tech 2002.  This line of argument was rejected by the Supreme Court of Alabama in *Woodson v. Hare,* 13 So.

---

[62]Jon Lowe testified that this arrangment was for the sole benefit of the Heart of Dixie's (and, thereby, PCA's) Dixie Tech 2002, and not for the personal benefit of himself or any other member of the defendant organizations.

2d 172 (Ala. 1943), holding that

> [a]n actual contract or one implied in fact is not always necessary to create a bailment.  *Where . . . one person has lawfully acquired the possession of personal property of another* and holds it under circumstances whereby he ought, upon principles of justice, to keep it safely and restore or deliver it to the owner, such person and the owner of the property are, *by operation of law*, generally treated as bailee and bailor under a contract of bailment, *irrespective of whether or not there has been any mutual assent*, expressed or implied, to such relationship.

*Id*. at 174 (citation omitted) (emphasis supplied).  *Cf. Ingersoll-Rand Financial Corp. v. Nunley,* 671 F.2d 842, 845 (4th Cir. 1982) (applying West Virginia law and holding that "'no particular ceremony or actual meeting of minds is necessary [to create a bailment]; it is the element of lawful possession, however created, and duty to account for the thing as the property of another that creates the bailment, regardless of whether or not such possession is based on contract in the ordinary sense.'") (quoting *Barnette v. Casey,* 19 S.E. 2d 621, 623 (W. Va. 1942)).  Of course, Heart of Dixie (and, thereby, PCA) lawfully acquired and accepted possession of plaintiff's automobile, and agreed to return it to plaintiff after a period of time.  Even if there was no "meeting of the minds" as to exactly how long that period of possession was supposed to be, the bailment relationship still existed.

PCA also argues that it did not enter into a bailment relationship with plaintiff because Jon Lowe made all arrangements with Dale Miller, not with plaintiff.  This

is a distinction that works no difference in applicable legal principles.  PCA cites no

authority to support its argument.  There is none.  It is well-established that "[a]n

agent may contract on behalf of a principal when the agent has express, implied, or

apparent authority to do so."  *Cooks Pest Control, Inc. v. Rebar,* 852 So. 2d 730, 747

(Ala. 2002) (See, J., dissenting) (citing *Lawler Mobile Homes, Inc. v. Tarver,* 492 So.

2d 297, 304 (Ala. 1986)).  No party disputes that Miller possessed the authority to act

on plaintiff's behalf.  Thus, the fact that PCA dealt with Miller, and not directly with

plaintiff, does not negate the existence of a bailment relationship between PCA and

plaintiff.

Finally, PCA contends that, even if a bailment relationship did form upon the

initial delivery of plaintiff's Porsche to Huntsville and Jon Lowe's acceptance of it,

the relationship terminated three weeks after Dixie Tech 2002, because that was the

maximum period of time Lowe, Collins, or anyone else affiliated with Heart of Dixie

expected the Porsche to be stored in Collins's garage.  PCA cites *Learned-Letcher*

*Lumber Co. v. Fowler,* 19 So. 396 (Ala. 1896), as support for its argument that,

"where the duration of bailment for hire is not expressed, it may be terminated by

either party."[63]  PCA stretches the rule of decision in that case too far.

In *Fowler* the Supreme Court of Alabama confronted a bailment in which the

---

[63]Doc. no. 59 (post-trial brief by defendants PCA, Heart of Dixie, and Lowe), at 7.

duration of the relationship was not expressed, and held that the bailment therefore was "subject to termination at the will of bailor and bailee.  Neither could insist, against the election of the other, that it should continue." *Id*. at 398.  That principle does not apply here, however.

*Fowler* does not stand for the proposition that a bailment *automatically* terminates when the duration of the relationship is not expressed; instead, *Fowler* holds that either party may *act* to terminate it.  In other words, although there may have been no definite agreement as to how long plaintiff's Porsche would remain in Collins's garage following the conclusion of Dixie Tech 2002, the bailment relationship between plaintiff and PCA would not terminate until such time as one of the parties to it took some affirmative step to unequivocally declare it at an end. Here, Collins testified (and offered copies of emails stating) that he desired the Porsche to be removed from his garage earlier than it actually was.  He informed Jon Lowe and certain Heart of Dixie officers of his desire, and asked for their assistance in arranging for pickup of the Porsche.  Jon Lowe relayed Collins's concerns on to Miller, and requested that he contact Collins.  Even so, these actions did not *terminate* the bailment.  Collins testified that he never refused to keep the automobile in his garage any longer, and he never removed the car from his shop in an attempt to

redeliver it to Miller.[64]  Despite Lowe's prodding of Miller to retrieve the car as soon as possible, neither Lowe, nor any other PCA representative, ever declared that the agreement to store the car had terminated, and no party took any actions inconsistent with an intent to continue to store the car safely until Miller retrieved it.[65]

Based upon the foregoing, the court concludes that a bailment relationship existed between plaintiff and PCA.  The extent of the legal duty owed by PCA as bailee hinges, as previously discussed, upon whether the bailment was gratuitous, for hire, or for the mutual benefit of the parties.  The court concludes that this bailment existed for the mutual benefit of plaintiff and PCA.  PCA received the benefit of displaying a rare 908/3 racing model at Dixie Tech 2002 — a display that PCA members described as a "major attraction" for the event.  Plaintiff, in turn, received the benefit of storing his car without charge for a period of at least six weeks.  He also was able to engender the goodwill of other PCA members, fellow Porsche enthusiasts who might serve as useful contacts in the future, particularly if plaintiff intended (as he claims) to "rent" the 908/3.

PCA therefore owed plaintiff a duty to "exercise reasonable care to preserve the property from loss or injury . . . ."  *White Swan Laundry v. Blue,* 137 So. 898, 899

---

[64]Indeed, by Collins's testimony, the only time plaintiff's car left his shop was when he and Swanson drove it on the day of the wreck.

[65]The actions of Collins and Swanson in driving the car are excluded from this statement, of course.

(Ala. 1931).  *See also Niagra Fire Ins. Co. v. Dog River Boat Service, Inc.,* 187 F.
Supp. 528, 531 (S.D. Ala. 1960) (applying Alabama law and holding that a bailee for
mutual benefit owed the bailor a duty "to exercise ordinary and reasonable care in the
protection of the [property]").  In other words, PCA was bound to exercise "the
degree of care that a person of ordinary prudence would take of the property, under
the same circumstances, as if it were his own."  *Brickens v. Sikes,* 68 So. 801, 802
(Ala. 1915) (citations omitted).

That which constitutes "ordinary" or 'reasonable" care under one set of
circumstances, however, might not under different facts.  As the Alabama Supreme
Court observed long ago,

> "'[d]iligence is a relative term, and it is evident that what would amount
> to the requisite diligence at one time, in one situation, and under one set
> of circumstances, might not amount to it in another.  The deposit is to be
> kept with the care applicable to it under the circumstances." . . . And the
> degree of care any and every bailee must bestow is materially dependent
> upon the nature and value of the thing bailed, and its liability to loss or
> injury.  As is said by Judge Story: "A man would not be expected to take
> the same care of a bag of oats as of a bag of gold; of a bale of cotton as
> of a box of diamonds or other jewelry; of a load of common wood as of
> a box of rare paintings; of a rude block of marble as of an exquisitely
> sculptured statute.  The value, especially, is an important ingredient to
> be taken into consideration upon every question of negligence, for that
> may be gross negligence in the case of a parcel of extraordinary value
> which in the case of a common parcel would not be so.  The degree of
> care which a man may reasonably be required to take of anything must,
> if we are at liberty to consult the dictates of common sense, essentially
> depend upon the quality and value of the thing, and the temptation

thereby afforded to theft.  The bailee, therefore, ought to proportion his care to the injury or loss which is likely to be sustained by any improvidence on his part."

*Prince v. Alabama State Fair,* 17 So. 449, 451 (Ala. 1895) (internal citations omitted).  Thus, PCA was required to exercise that level of care appropriate to safeguarding a rare, vintage Porsche race car valued at three-quarters of a million dollars, as if the car were its own.

Plaintiff now must establish a legal hook upon which to hang PCA's liability for breach of this duty (and, thus, breach of the bailment agreement).  Plaintiff apparently recognizes that he has no *reasonable* argument that Swanson and Collins were acting within the scope of their relationship with PCA when they drove and wrecked the car.  He attempts to circumvent that problem by arguing that PCA's duty to store his car safely and return it to him in an undamaged condition at the completion of the bailment was non-delegable.  This argument might be successful, *if* Swanson and Collins could be considered independent contractors, because a party who owes a duty under law or contract may not absolve itself of that duty merely by delegating it to an independent contractor for performance.  *See, e.g., Fuller v. Tractor & Equipment Co.,* 545 So. 2d 757, 758-59 (Ala. 1989); *W.E. Belcher Lumber Co. v. Woodstock Land & Mineral Co.,* 15 So. 2d 625, 628 (Ala. 1943) ("a person causing something to be done, the doing of which casts on him a duty, cannot escape

from the responsibility attaching to him, of seeing that duty performed, by delegating it *to a contractor*.") (emphasis supplied).

The more reasoned conclusion, however, is that Lowe, Collins, and Swanson were *agents* of PCA.[66]  Plaintiff devotes a substantial portion of his post-trial brief to arguing that Collins and Swanson were agents of PCA, acting within the scope of their agency.  Plaintiff makes the same argument in seeking to hold PCA liable for mental distress damages.  Thus, plaintiff himself views Collins and Swanson as PCA's agents.  PCA seems to concede that Collins and Swanson were its agents.[67] Based on all of the above, the court concludes that Collins and Swanson were PCA's agents, and not independent contractors.  Thus, the principle that PCA could not delegate its duty to care for the 908/3 to Collins and Swanson as independent contractors — and thereby absolve itself from liability — does not apply.

---

[66]See *Dickinson v. City of Huntsville,* 822 So. 2d 411 (Ala. 2001), holding that:

> The test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent.  In determining whether a person is an independent contractor, we use the "right-of-control" test, and we consider four factors:  (1) direct evidence of the right or exercise of control; (2) the method of payment used; (3) whether the alleged principal had the right to terminate employment; and (4) the right to control another's time.  The party asserting the existence of an agency relationship has the burden of presenting sufficient evidence to prove the existence of that relationship.  Agency may not be presumed.  The plaintiff must present substantial evidence of an agency relationship.

*Id*. at 416 (citations and internal quotation marks omitted).

[67]*See* doc. no. 59 (post-trial brief of defendants PCA, Heart of Dixie, and Jon Lowe), at 10 (referring to Collins and Swanson as the "agents of PCA, Lowe and [Heart of Dixie]").

Even so, a related principle — unique to bailment law, and either ignored or overlooked by the parties — provides the legal hook on which PCA's liability is securely snagged.   A cause of action for breach of a bailment agreement — as opposed to negligent performance of one — arises when the bailee violates its express or implied promise to care for and return the bailor's property in undamaged condition.

PCA implicitly promised to store and safeguard plaintiff's Porsche, and to return it to him in undamaged condition.  PCA breached that promise by returning the car in a severely damaged condition.  That conclusion would hold even if Collins and Swanson were acting outside the scope of their agency relationship when they drove the Porsche, as demonstrated by the Supreme Court of Alabama's decision in *Southern Garage Co. v. Brown,* 65 So. 400 (Ala. 1914), affirming a judgment against a garage owner for damages to a customer's car that occurred when an employee of the garage drove the customer's car without permission, and outside the scope of his employment.  After concluding that a bailment for the mutual benefit of the parties existed, the court stated:

> The fact that the chauffeur took the automobile to Avondale out of the proper way for some purpose of his own did not relieve the defendant of responsibility for its safe-keeping.  At the time of the mishap to the machine defendant's servant had not completed the service it was his duty to perform.  He was still engaged upon that service, though

performing it contrary to his master's command and making his performance serve a purpose of his own.  As we have said, he had possession by virtue of his employment and his employer's contract of bailment.  If he had acquired possession without the master's knowledge or consent, express or implied, or if, having acquired possession by the master's express command, as evidently he did, he had in the operation of the machine negligently caused injury to a stranger to the contract, a different question would be presented about which there might possibly be more or less difficulty.  But on the facts here shown, and on the principles already stated, we think there can be no doubt that the possession of defendant's servant was the possession of defendant, and that defendant was answerable for its servant's negligence in the matter of the safe-keeping of the automobile, *notwithstanding the latter's divagation from the strict line of his duty.*

*Id.* at 401 (emphasis supplied).[68]

In summary, pursuant to the bailment between plaintiff and PCA, the latter organization implicitly agreed to *safely* store plaintiff's car until he retrieved it.  PCA delegated that duty to Collins, by asking that he store the car in his garage.  The only reason Collins came into possession of plaintiff's Porsche was because of his agency relationship with PCA.  The only reason Swanson drove the car is because Collins allowed him to do so.  It cannot *reasonably* be argued that Collins and Swanson were acting within the line and scope of the agency relationship, especially under the sotted circumstances described.[69]  Even so, according to the *Brown* decision*,* PCA still must

_____

[68]Most other state courts considering this issue have agreed with the Alabama courts.  See the Appendix to this opinion for a discussion of these cases.

[69]Collins's agency agreement with PCA encompassed his storing plaintiff's Porsche in his garage.  Taking the car for a "joyride" was not only outside the scope of this agreement, it was directly contrary to the agreement.

be held liable for the negligent actions of Swanson and Collins.

## PART THREE

### *Damages*

Plaintiff requests a total of $841,283.11 in damages.  He itemizes that amount

as follows:

| | | |
|---|---|---|
| (1) | Repair Costs | $221,227.00[70] |
| (2) | Transportation of the 908/3 to California for repairs after the wreck | $1,500.00[71] |
| (3) | Transportation of the 908/3 to Massachusetts after repairs were complete | $2,000.00 |
| (4) | Travel costs incurred by Dale Miller while coordinating the post-accident restoration of the 908/3 | $7,356.11[72] |
| (5) | Track fees and transportation for re-testing the 908/3 following the post-accident repairs | $1,700.00[73] |
| (6) | Cost of insurance on the 908/3 during the three- | |

---

[70]*See* Trial Exhibits 2T, 2U, 2V, and 8.

[71]*See* Trial Exhibit 14 (Deposition of Dale Miller), at 30, 171.  Miller testified that the cost of shipping the 908/3 from California to Huntsville for Dixie Tech 2002 was $1,500.00.  After the wreck, the 908/3 was sent back to the same shop in California where it had previously been repaired. Thus, the shipping costs from Huntsville to California would have been $1,500.00, the same as the costs to ship from California to Huntsville.

[72]*See* Miller Deposition, at 53; Romano Deposition, at 31; Trial Exhibit 8A.  Miller testified that he incurred $7,356.11 in travel expenses while coordinating the restoration of the 908/3 after the wreck.  Plaintiff testified that he planned to reimburse Miller for these expenses.

[73]*See* Miller Deposition, at 54.

year time period it was in the shop after the wreck          $7,500.00[74]

(7)     Loss of use of the 908/3 for rental purposes during
        the three-year time period it was in the shop
        after the wreck                                      $300,000.00[75]

(8)     "Hedonistic damages," or "upset and aggravation
        at loss of unique motorcar by acts of others"        $300,000.00.

No defendant has objected to plaintiff's entitlement to items 1 through 5, and the court finds the amounts to be reasonable, and to represent damages flowing as a direct result of defendants' actions.

With regard to item number 6, however, the court can discern no basis for awarding plaintiff the cost of his insurance premiums during the three-year time period the 908/3 was being repaired after the wreck. As plaintiff had his 908/3 insured prior to the wreck, it is logical to conclude that he would have kept the car insured throughout the three-year time period following Dixie Tech 2002, even if it had not been wrecked. Thus, the insurance premiums are not an item of damage that plaintiff suffered as a proximate result of the wreck, and they are not recoverable from any defendant in this action.

---

[74]Plaintiff testified in his deposition that he paid $2,000 per year for insurance premiums during the three-year time period when the 908/3 was being repaired after the wreck. *See* Romano deposition, at 28, 40-41.

[75]In the event the court disallows the lost rent damages, plaintiff requests an alternative damage award of $192,000.00, representing the loss of use of his (allegedly) $800,000.00 investment in the 908/3 for the three-year time period it was being repaired.

Plaintiff's request for loss of the use of his Porsche (item number 7) also requires close scrutiny.

> "The rule in Alabama for the measure of damages for the injury to *a commercial vehicle* is the damages which would remunerate the plaintiff for necessary repairs in substantially restoring the vehicle to its former condition *and the market value of its use or hire during the time required to make such repairs and fit it for business*."

*Kemp's Garage, Inc. v. Poole Truck Lines, Inc.,* 606 So. 2d 144, 145 (Ala. Civ. App. 1992) (emphasis supplied) (quoting *Wilson & Co. v. Sims,* 34 So. 2d 689, 690 (Ala. 1948)) (other citations omitted). Such damages, like "lost profits," are not recoverable if they are speculative, or only remotely related to a defendant's wrongful acts. *See Garrett v. Sun Plaza Development Co.,* 580 So. 2d 1317, 1320 (Ala. 1991) ("Profits from business ventures that could have been entered into had this one not been undertaken are too speculative to be considered when awarding damages."). *Cf. Crommelin v. Montgomery Independent Telecasters, Inc.,* 194 So. 2d 548, 551 (Ala. 1967) (lost profits as a result of losing a political campaign were too speculative and remote to be recovered). Rather, in Alabama, "anticipated profits of an unestablished business may be recovered [only] if such damages are proved with 'reasonable certainty.'" *Kirkland & Co. of Anniston v. A & M Food Service, Inc.,* 579 So. 2d 1278, 1285 (Ala. 1991) (citing *Super Valu Stores, Inc. v. Peterson,* 506 So. 2d 317 (Ala. 1987); *Morgan v. South Central Bell Telephone Co.,* 466 So. 2d 107 (Ala.

-45-

1985)).

Plaintiff's right to recover for the loss of the rental value of his 908/3 cannot be established with "reasonable certainty."  Miller testified that he did not know whether plaintiff intended to rent his 908/3, but he did know that none of the other twelve 908/3 models had ever been rented by their owners.[76]  Plaintiff testified that he had "entertained" thoughts of renting his 908/3, to defray some of the restoration costs, but admitted that he had not made a final decision to do so.[77]  He also acknowledged that he had not entered into any agreements to rent the car, and that he had not rented any of his other cars in the past.[78]  Plaintiff's entitlement to the loss of the rental value for his 908/3 is speculative at best and, consequently, no such damages will be awarded.

Plaintiff also claims that, in the event he is not awarded "loss of rental value" damages, he is, alternatively, entitled to recover for the loss of use of his investment in the 908/3 over the three-year period it was being repaired after the wreck.[79]  Plaintiff offers no authority, other than his deposition testimony, to support this argument.  In his deposition, plaintiff testified that he has earned an average of seven

---

[76]Miller Deposition, at 137-38.

[77]Romano Deposition, at 64-65, 84.

[78]*Id.* at 65, 73, 84.

[79]*See supra* note 75.

to eight percent on all of his investments over the past fifteen years.  Thus, plaintiff claims he is entitled to an award of $192,000.00 — representing an eight-percent return on the $800,000.00 value of the car over three years — for the loss of his use of the investment.  Apart from being unsupported by any legal authority, this claim is far too speculative.  There is no indication that plaintiff actually did lose any investment income due to the car being wrecked and in the shop.  If the car had been in his possession, he likely would have enjoyed it, driven it, raced it, and displayed it, but there is no evidence that he had any immediate plans to sell it for a profit.  Further, plaintiff offered only his own testimony as to how much interest he would have expected to earn on the money he had invested in the car.  Plaintiff is not a financial expert, and his self-serving testimony in this regard cannot be regarded as authoritative.  Accordingly, he will not be awarded damages for loss of his investment in the 908/3.[80]

Finally, plaintiff cannot recover damages for mental anguish, pain and suffering, or what he also refers to as "hedonistic damages."  Plaintiff asserts he is

---

[80]Even if plaintiff were entitled to "loss of investment" damages, plaintiff's calculation of damages is skewed.  First, plaintiff testified that he has consistently earned a seven to eight percent return on his investments.  His calculations of damages are based on the higher number in that range: *i.e.,* eight percent.  Plaintiff offers no justification for why the eight percent figure should be used, rather than the seven percent figure.  Further, plaintiff did not have an *investment* of $800,000 in the 908/3.  He testified that he paid approximately $440,000.00 for the car in 1999, and that he expended approximately $120,000.00 to have it restored initially.  Thus, plaintiff's investment in the 908/3 totaled approximately $560,000.00, *not* $800,000.00.  *See* Romano Deposition, at 6-7.

entitled to these damages because of Swanson's and Collins's "contumacious behavior" and indifference to his property rights in the 908/3. Plaintiff also claims that PCA should be required to pay these damages because Collins and Swanson were acting as agents of PCA, and PCA is vicariously liable for their negligence. His arguments are not persuasive. Even the cases cited by plaintiff point to a contrary result.

> In negligence actions, Alabama follows the "zone-of-danger" test, which limits recovery of mental anguish damages "to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."

*Wal-Mart Stores, Inc. v. Bowers,* 752 So. 2d 1201, 1203 (Ala. 1999) (quoting *AALAR, Ltd., Inc. v. Francis,* 716 So. 2d 1141, 1147 (Ala. 1998)). This is an exception to the general rule that "damages for mental anguish are not recoverable in tort where the tort results in mere injury to property unless the damage to property is committed under circumstances of insult or contumely." *Id.* at 1204 (citations omitted). "Thus, in negligence actions involving damage only to property, the 'insult or contumely' exception does not apply. Instead, in negligence actions, the applicable test is the zone-of-danger test." *Id.* (citations omitted).

In the present case, plaintiff did not sustain any physical injury as a result of defendants' conduct, and he was not placed in immediate risk of physical harm. In

fact, plaintiff was in another state when his car was wrecked.  As plaintiff was not within the "zone of danger," he cannot recover damages for mental anguish resulting from damage to his property, regardless of whether defendants acted with insult, or under circumstances of "contumely."

**PART FOUR**

*Conclusion*

In accordance with the foregoing, judgment will be entered against plaintiff, and in favor of defendants Margie M. Collins, Jon Lowe, and the Heart of Dixie Region of the Porsche Club of America, Inc.  Judgment will be entered in favor of plaintiff, and against defendants Charles P. Swanson, Cary C. Collins, and the Porsche Club of America, Inc., jointly and severally, in the amount of $233,783.11.

DONE this 7th day of June, 2006.

_____
United States District Judge

**APPENDIX**

*Collection of Cases — Liability of Bailee for Actions of Agent Acting Outside Scope of Employment*

In *Dickson v. Blacker,* 253 S.W.2d 728, 729 (Tenn. 1952), the Tennessee Supreme Court held a garage owner liable, under a bailment-for-hire theory, when an employee of the garage drove the plaintiff's car "at a very rapid rate of speed around a curve[,] had run it into a telephone post and wrecked it." *Id.* at 729. The court stated:

> Under the contract of bailment between the plaintiff and the defendant, the defendant was not an insurer of the safety of the automobile, but was bound to exercise ordinary care for its safety. If, in the performance of that duty, he chose to delegate such performance to his servant he is responsible to the bailor for the manner in which it is performed, as if he had performed it himself, and whether or not the servant was acting outside the scope of his employment. This was held by the Western Division of the Court of Appeals in *Roths Central Garage v. Holmes,* 10 Tenn. App. 500. In that case the Court of Appeals quoted with approval from an opinion of this Court in *Pullman Palace Car Co. v. Gavin,* 93 Tenn. 53, 23 S.W. 70, 21 L.R.A. 298 as follows:
>
> > 'When by contract or statute the master is bound to do certain things, if he intrusts [sic] the performance of that duty to another, he becomes absolutely responsible for the manner in which the duty is performed, precisely the same as though he himself had performed it, and that without any reference to the question whether the servant was authorized to do the particular act. Where the master, by contract or operation of law, is bound to do certain acts, he cannot excuse himself from liability upon the ground that he has committed that duty to another, and that he

never authorized such person to do the particular act.  Being bound to do the act, if he does it by another, he is treated as having done it himself, and the fact that his servant or agent acted contrary to his instructions, without his consent, or even fraudulently, will not excuse him.'

. . . .

Under the view that we take of this case such a holding does not make a garage keeper an insurer of the property of the automobile owner.  If the automobile had been damaged through no fault of the garage keeper or his servant but through the fault of a third party over whom the garage keeper had no control then clearly the garage keeper would not be liable.  Under the view that we take of the matter (this being the same view of the two lower courts) the garage keeper merely becomes liable for the acts of his servant regardless of whether these acts were committed within or without the scope of the servant's employment.  The damage to the car was due to the tort of the servant of the garage keeper.  There was an abundance of evidence in the record that this servant was guilty of negligent, careless operation of the plaintiff's automobile.  He drove around a 90-degree corner at such a speed as to lay down 25 feet of tire marks.  The automobile made a screeching noise as it rounded the corner and defendant's servant drove it into a telephone post.  He later returned to his employer, the garage keeper, and admitted that he had wrecked the car.

In modern times the motorist puts his automobile in the hands of a garage keeper or parking lot operator for safekeeping almost daily and it remains there anywhere from one hour to extended periods of time.  The parking lot or garage is almost always in charge of an employee.  The automobile owner is therefore at the mercy of the garage keeper's servants.  To allow the garage keeper to escape liability for the unauthorized tort of his servant would under circumstances as set forth in this case be a failure of justice.

*Dickson,* 253 S.W.2d at 729-30.  The appellate courts of Illinois have elaborated on

-51-

the principle as follows:

> In *Evans v. Williams et al.,* 232 Ill. App. 439, suit was brought by the owner of an automobile he had placed in defendants' garage for safe keeping, charging that defendants failed in this respect.   One of defendants' employees took plaintiff's car out of the garage for a "joy ride" and wrecked it by running into a freight train.   It was contended defendants were not liable for the damages caused to the automobile through the wrongful act of their employee because the employee when he took the car did so without authority and was acting wholly outside the scope of his employment.   We held this contention untenable and said, p. 442: "It is well established that the bailee is not an insurer and is liable only for the exercise of ordinary care in protecting the property intrusted to him, but it does not follow that the limitations on liability for a servant's negligence, in the usual action by a third party sounding in damages for tort alone, should be extended to an action for breach of a contract of bailment.   In bailment the contract is in its nature a direct and personal obligation by which the bailee undertakes personally to keep safely the property committed to his care.   It is an obligation from which he cannot relieve himself without the other's consent.   *Jacobs v. Grossman,* 310 Ill. 247 [141 N.E. 714].   The actual work of guarding the property may be delegated to an employee, and in the customary way of conducting many businesses this must be done during certain hours of the day, but the bailee is not thereby relieved from the personal obligation of his contract.   An employee to whom such duty is delegated stands in the place of his employer and any negligence of this employee in protecting the property is the negligence of the employer, who can be made to respond in damages caused thereby.   Any other rule would have a tendency to tempt a bailee to lessen his personal liability for damages by delegating to irresponsible servants the care of the property.   This would be unjust to the bailor as increasing the risk to the property and decreasing his chances of obtaining adequate compensation for damages thereto.   The primary and essential object of this contract of bailment was the safety of the automobile, and no rule of law should tend to diminish this by putting a premium on lack of personal attention."

In *Maynard v. James et al.,* 109 Conn. 365, 146 A. 614, 65 A.L.R.

427, suit was brought to recover damages for injuries to plaintiff's automobile alleged to have been caused by the failure of defendants, as bailees for hire, to exercise ordinary care. Plaintiff had judgment, which was affirmed on appeal. One of defendants' employees took the car out of defendants' garage and wrecked it by driving it against a wall and a telephone pole. The court said (109 Conn. at page 367, 146 A. at page 615, 65 A.L.R. 427): "The argument of the defendants is largely based upon the thesis that they are not liable for the negligence of the helper because at the time of the accident he was not acting within the scope of his employment. However that may be, their contention overlooks a clear breach of duty which fastens an unquestionable liability upon them. * * * When the plaintiff left the car in the garage, the defendants, as bailees for hire, assumed the obligation not only to use due care in the performance of the services required, but to keep it in their garage * * * for redelivery to the plaintiff when he should come for it. * * * The driving of the car out of the driveway into the street and its subsequent operation was a wholly unauthorized use which, had the defendants done it themselves, certainly would have constituted a clear breach of duty. * * * [109 conn. at page 368, 146 A. at page 615, 65 A.L.R. 427.] this duty of the defendants was contractual in nature; it required performance, and while no doubt they might delegate that performance to another for a breach of it, whether by themselves or by that other, they would be liable." The court then discusses with approval *Corbett v. Smeraldo,* 91 N.J.L. 29, 102 A. 889, and quoted the following from that case: "We think this case does not involve the question of the master's responsibility for the tortious acts of his servants. It involves rather the question of the master's liability for breach of his own contract. * * * What were the terms of the contract? Those terms are rarely expressed at length. Much must be left to implication and be determined in accordance with the business usages and the customs of the times. * * * The jury could hardly avoid the inference that the automobile was left with the defendant for storage in his garage. Storage involved keeping the automobile there and not permitting it to go out without the plaintiff's authority. If the defendant chose to entrust that duty to his night man, he was liable, not because the night man was negligent, but because the defendant himself had been guilty of a breach of his contract of storage. * * * There was a breach of the contract to store as soon as

the automobile was taken out of the garage.   For what subsequently happened, the defendant might or might not be liable under the rule of respondeat superior."

*Oscar Heyman & Bros., Inc. v. Marshall Field & Co.,* 22 N.E. 2d 776, 779-80 (Ill. App. Ct. 1939) (bracketed alterations and asterisks in original).  *See also Pratt v. Martin,* 35 S.W. 2d 1004 (Ark.1931); *Walters v. United States Garage,* 160 A. 758 (Me. 1932); *Metzger v. Downtown Garage Corp.,* 82 A. 2d 507 (Pa. Super. 1951); *Powell v. A.K. Brown Motor Co.,* 20 S.E. 2d 636 (S.C. 1942).  *But see Castorina v. Rosen,* 49 N.E. 2d 521 (N.Y. 1943); *Firemen's Fund Ins. Co. v. Schreiber,* 135 N.W. 507 (Wis. 1912).